**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MICHAEL SICKLES, | CASE NO. 3:15-cv-02419-WJN |
| Plaintiff, | (JUDGE NEALON) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL |
| Defendant. | Docs. 1, 5, 6, 7, 8 |

## REPORT AND RECOMMENDATION

### I.     Procedural Background

On September 20, 2010, Michael Sickles ("Plaintiff") filed as a claimant for disability benefits under Title II and XVI of the Social Security Act, 42 U.S.C. §§ 401-434, 1181-1183f, with a last insured date of December 31, 2013,[1] and alleged an amended disability alleged onset date of November 22, 2010, the date of his fiftieth birthday.  (Administrative Transcript (hereinafter, "Tr."), 10, 12, 270, 292). The ALJ held a hearing on March 13, 2012, denied the claim on April 11, 2012,

---

[1] Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. 42 U.S.C. §§ 415(a) and 416(i)(1). The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." *See* 42 U.S.C. § 416(i)(2); *accord Renfer v. Colvin*, No. 3:14CV611, 2015 WL 2344959, at *1 (M.D. Pa. May 14, 2015).

and the claim was appealed to the United States District Court.  (Tr. 330-56).  On September 25, 2014, the United States District Court remanded the claim, which the Appeals Council remanded to the ALJ on October 27, 2014.  (Tr. 322-25, 330-356).  The ALJ held a second hearing on April 7, 2015.  (Tr. 289-304).  On September 30, 2015, the ALJ found that Plaintiff was not disabled within the meaning of the Act.  (Tr. 267-281).

On December 16, 2015, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits.  (Doc. 1).  On February 16, 2016, the Commissioner ("Defendant") filed an answer and an administrative transcript of proceedings.  (Doc. 5, 6).  On April 1, 2016, Plaintiff filed a brief in support of the appeal.  (Doc. 7 ("Pl. Brief")).  On May 4, 2016, Defendant filed a brief in response.  (Doc. 10 ("Def. Brief")).  On November 7, 2016, the Court referred this case to the undersigned Magistrate Judge.

### III. Relevant Facts in the Record

Plaintiff was born in November 1960 and thus was classified by the regulations as an individual closely approaching advanced age through the date of the ALJ decision rendered on September 30, 2015.  (Tr. 277); 20 C.F.R. §

404.1563(d).  Plaintiff alleged disability due to a torn rotator cuff on the left and due to a right shoulder injury.  (Tr. 148).  Plaintiff graduated high school and has prior work experience as an iron worker for thirty years.  (Tr. 52).  Earnings reports demonstrate that Plaintiff met the earning threshold for four quarters of coverage[2] from 1979 to 1994, and from 1997 to 2008.  (Tr. 124, 126, 131-140).

During the March 2012 hearing, Plaintiff testified that he stopped medical treatment due to the cost but that he had not applied for a medical access card because he was scared of getting denied.  (Tr. 56).  During the April 2015 hearing, Plaintiff testified that he received no medical care since 2011 when he last saw Dr. Petrucelli, did not have a medical access card, and had no medical insurance.  (Tr. 294).  Plaintiff further testified that he had not thought about or tried less demanding work than his past work as an iron worker.  (Tr. 297).

///

///

///

---

[2] In a claimant's earnings record, a "c" indicates that a claimant has earned enough to qualify for a quarter of coverage and an "n" indicates that the threshold amount was not earned in a given quarter.  *See* "Understanding an earnings record," 1 Soc. Sec. Disab. Claims Prac. & Proc. § 5:21 (2nd ed.).  For example, in 2000, "cccc" would indicate that a claimant has earned at least $780 each quarter of 2000 and "cccn" would indicate that a claimant earned at least $780 for the first three quarters of 2000.  *See Weidman v. Colvin*, No. CV 3:14-552, 2015 WL 5829788, at *11 n. 4 (M.D. Pa. Sept. 30, 2015).

## A. Relevant Treatment History and Medical Opinions

### 1. Dr. Robert Petrucelli, M.D.

On May 14, 2008, Plaintiff reported severe bilateral shoulder pain. (Tr. 248). Dr. Petrucelli diagnosed Plaintiff with recurrent rotator cuff tendonitis with pain on elevation of his shoulders beyond 90 degrees, and noted that an x-ray showed he had a cyst in his right proximal humerus. (Tr. 248). Dr. Petrucelli gave Plaintiff Marcaine and DepoMedrol injections, and placed him on Medrol Dosepak. (Tr. 248). Plaintiff reported that only Tylenol #3 alleviated his pain. (Tr. 248). On May 23, 2008, Plaintiff reported recurrent pain in his left shoulder. (Tr. 247). Dr. Petrucelli noted that Plaintiff had some pain on adduction, pain on abduction, and pain external rotation. (Tr. 247). Dr. Petrucelli gave Plaintiff another Marcaine and Depo-Medrol injection and noted that he was taking his prescribed Tylenol #3. (Tr. 247).

On June 12, 2008, Dr. Petrucelli performed surgery on Plaintiff's left shoulder to repair his rotator cuff. (Tr. 257). Four days later, Dr. Petrucelli removed Plaintiff's sutures, and reported that he was doing well. (Tr. 246). On June 27, 2008, Plaintiff reported difficulty sleeping and was instructed to begin pendular and wall climbing exercises for his shoulder. (Tr. 245). On July 9, 2008, Dr. Petrucelli noted that Plaintiff was "doing well," had "excellent" passive range

of motion, and was able to climb the wall relatively comfortably.  (Tr. 245).
Plaintiff complained of some catching which Dr. Petrucelli noted that such could
be expected.  (Tr. 245).  Dr. Petrucelli prescribed physical therapy for Plaintiff,
which he began on July 11, 2008.  (Tr. 245, 212).

On September 15, 2008, Plaintiff reported pain.  (Tr. 244).  Dr. Petrucelli
noted that Plaintiff was still in physical therapy and had relatively good range of
motion with good strength.  (Tr. 244).  Dr. Petrucelli gave Plaintiff a Lidocaine and
Depo-Medrol injection.  (Tr. 244).  On September 24, 2008, Dr. Petrucelli reported
that Plaintiff, who was not taking any significant pain medication, was doing
better.  (Tr. 244).  Plaintiff's physical therapy treatment notes showed he was
improving.  (Tr. 244).  On examination, Plaintiff had full internal range of motion,
which Dr. Petrucelli noted was "unusual following any type of shoulder problems."
(Tr. 244).  X-rays of his right shoulder taken that day showed that the implants
were in place.  (Tr. 244).  Dr. Petrucelli concluded that Plaintiff had fairly good
range of motion, was improving "nicely," and encouraged him to go swimming.
(Tr. 244).

On October 15, 2008, Plaintiff reported still experiencing pain and described
a "catching-type sensation."  (Tr. 243).  Dr. Petrucelli noted that he was "not sure"
what was causing Plaintiff's pain because he had fairly good strength and fairly

good range of motion.  (Tr. 243).  Dr. Petrucelli noted that Plaintiff had problems with the extremes of abduction and external rotation and had also been experiencing pain in his right shoulder.  (Tr. 243).  Dr. Petrucelli ordered an MRI of Plaintiff's right shoulder, and an MR arthrogram of his left shoulder.  (Tr. 243). Dr. Petrucelli planned another arthroscopic repair of his left shoulder.  (Tr. 243).

On November 10, 2008, Dr. Petrucelli noted that a recent MRI of Plaintiff's left shoulder revealed that Plaintiff had a re-tear of his rotator cuff.  (Tr. 243).  Dr. Petrucelli noted that Plaintiff had an excellent range of motion, experiences weakness after working for a period of time, and "fairly good strength to an adduction force."  (Tr. 243).  On November 20, 2008, Plaintiff had a second surgery on his left shoulder.  (Tr. 256).

On December 3, 2008, Dr. Petrucelli reported that Plaintiff was "doing well," still recovering from his surgery and wearing a sling, reported no significant pain, and was not taking any pain medication.  (Tr. 242).  On December 15, 2008, Plaintiff was "doing well" and had fairly good range of motion in pendular exercises and wall climbing.  (Tr. 241).  During this time, Plaintiff was going to physical therapy.  (Tr. 181-85, 241).  Dr. Petrucelli noted that if Plaintiff needed further surgery, he would refer him to see a specialist such as Dr. Jeff Abrams. (Tr. 214).  On December 29, 2008, Plaintiff reported that his pain was "minimal to

moderate."   (Tr. 241).   Dr. Petrucelli noted that Plaintiff still had "some restriction." (Tr. 241).

January 19, 2009, was noted as a "no show," and on January 23, 2009, Plaintiff reported that he was doing "fair," still experienced pain, and a "catching sensation." (Tr. 240).  Dr. Petrucelli noted that Plaintiff would continue physical therapy for another four weeks and doubted that Plaintiff could return to strenuous overhead activity.  (Tr. 240). Dr. Petrucelli noted that Plaintiff was not taking any pain medication.   (Tr. 240).   On February 20, 2009, Plaintiff reported still experiencing some left shoulder pain.  (Tr. 240).  Dr. Petrucelli concluded that Plaintiff had "excellent range of motion," almost no shoulder shrug, and "fairly good function." (Tr. 240).

On March 20, 2009, Plaintiff indicated that he was tolerating his pain, although he continued to have discomfort. (Tr. 239).  Dr. Petrucelli referred him to Jeff Abrams, M.D. and noted that although Plaintiff wants to return to climbing buildings, Dr. Petrucelli was unsure that he should.  (Tr. 239).  The record contains no evidence that Plaintiff received any further treatment for his shoulder for over a year.

On April 16, 2010, Plaintiff reported that he could not get an appointment with Dr. Abrams, and he was "having difficulty working."  (Tr. 238).   Dr.

Petrucelli gave him a prescription for Ultram and noted that he cancelled an appointment for May 3, 2010.  (Tr. 238).   On September 20, 2010, Plaintiff indicated that he was having difficulty pulling himself on the iron pilings at work. (Tr. 238).  Plaintiff reported that his two prior surgeries had not helped his left shoulder and his right was equally symptomatic.  (Tr. 238).  Dr. Petrucelli gave him a prescription for Tylenol #4.  (Tr. 238).  Plaintiff canceled his April 29, 2011 appointment with Dr. Petrucelli (Tr. 237), and the record contains no further medical treatment.

### 2.  Ajay Kumar, M.D.

In a letter dated October 27, 2008, Dr. Kumar summarized Plaintiff's report of medical history and symptoms.  (Tr. 173).  Plaintiff reported that Dr. Petrucelli performed left shoulder surgery in June 2008 which reduced his pain from 9 to 7 out of ten.  (Tr. 173).  Plaintiff reported that he still experienced a significant amount of pain and Dr. Petrucelli wanted to perform an arthrogram to further evaluate the left shoulder.  (Tr. 173).  Plaintiff had a couple of cortisone injections in the left shoulder and reported little alleviation of the pain.  (Tr. 173).  Plaintiff reported that he completed most of a four-month course of physical therapy.  (Tr. 173).  Plaintiff was taking Tylenol No. 4 but did not like it because it made him feel "a little bit loopy."  (Tr. 173).  Dr. Kumar listed that Plaintiff had allergies to

Vicodin, Percocet, and Alieve.  (Tr. 173).  While Plaintiff reported a sore muscle, he denied experiencing spasms or cramps.  (Tr. 173).  Plaintiff reported that he smoked three packs of cigarettes per week and only gets two hours of sleep per night due to left shoulder pain.  (Tr. 174).

Upon examination, Dr. Kumar observed that Plaintiff's manual motor strength was 5/5 throughout the bilateral upper extremities, except for left supraspinatus, which was 4/5.  (Tr. 174).  With regards to Plaintiff's left shoulder range of motion, Dr. Kumar observed that abduction was limited to 90 degrees and forward flexion was limited to 80 degrees and was extremely painful.  (Tr. 174). Plaintiff exhibited "marked tenderness along the subacromial and supraspinatus area, and also he has a cracking sound coming from the left shoulder during the range of motion [examination]."  (Tr. 174).  Plaintiff's range of motion of the right shoulder was 140 degrees and painful.  (Tr. 174).  Plaintiff had a positive Hawkins and Kennedy sign in the right shoulder.  (Tr. 174).  Dr. Kumar assessed Plaintiff with a left shoulder rotator cuff tear status post-surgery and "right shoulder severe supraspinatus tendinitis/rotator cuff tear."  (Tr. 175).  Dr. Kumar scheduled a left arthrogram and prescribed Ultram ER.  (Tr. 175).

///

///

### 3.   MRI Diagnostic Imaging: Howard Hutt, M.D.

On October 18, 2008, Dr. Hutt interpreted a right shoulder MRI and concluded that Plaintiff had: 1) prominent subacromial subdeltoid fluid indicating bursitis; 2) a prominent intrasubstance tear of the supraspinatus tendon without defined full-thickness tear; 3) an infraspinatus tendon that was maintained; 4) a large area of cystic change along the greater tuberosity; 5) a small amount of joint fluid; and, 6) no AC impingement.  (Tr. 177).

On November 5, 2008, Dr. Hutt compared a left shoulder MRI taken that day with the MRI performed on June 7, 2008, and concluded that Plaintiff had: 1) prominent subacromial and subdeltoid fluid as well as joint fluid; 2) likely a complete supraspinatus tendon tear with retraction and also a prominent infraspinitus tendon tear; 3) degenerative changes along the glenoid and along the medial humeral head; and, 4) likely a superior glenoid labral tear.  (Tr. 176).

### 4.   State Agency Consultative Opinion: Dr. Sethuraman Muthiah, M.D.

On February 19, 2011, Dr. Muthiah conducted a consultative examination of Plaintiff.  (Tr. 218-25).  Dr. Muthiah summarized Plaintiff's medical history and noted that Plaintiff took four to five tablets of Tylenol #3 and two tables of Tylenol #4 per day.  (Tr. 223).  On examination, Dr. Muthiah observed left shoulder stiffness with tenderness to touch and tenderness in the anterior aspect of the right

shoulder.  (Tr. 224).  Dr. Muthiah observed that Plaintiff demonstrated "minimal paraspinal muscle spasm in the cervical region" and that the rest of the musculoskeletal system examination was "all well within normal limits."  (Tr. 224).  Plaintiff's gait was normal.  (Tr. 225).

While Dr. Muthiah checked boxes indicating that Plaintiff's reaching and handling was affected by his impairments, he opined that Plaintiff was still "able to perform fine and dexterous movements," hold a pen, turn keys, pick up small objects, zip, and unzip.  (Tr. 221, 225).  Plaintiff's deep tendon reflexes were normal.  (Tr. 225).  Dr. Muthiah concluded Plaintiff could frequently lift up to 20 pounds and carry 15 pounds.  (Tr. 221, 225).  Dr. Muthiah opined that Plaintiff had no limitation standing, walking, or sitting, and had no postural limitations.  (Tr. 221, 224-25).  Dr. Muthiah opined that Plaintiff had "limitation . . . reaching and handling with in the left upper extremity and to some extent in the right upper extremity."  (Tr. 224-25).

### 5.  Consultative Examination: Jay Willner, M.D.

On May 19, 2015, Dr. Willner completed a consultative examination.  (Tr. 424-36).  Dr. Willner noted that Plaintiff reported that he lived with a friend and did not cook, clean, do laundry, or shop due to his shoulder pain.  (Tr. 424).  Plaintiff reported that he was able to bathe and dress himself. (Tr. 424).  Plaintiff's

gait was normal, yet he had difficulty walking on his heels and toes due to pain and he demonstrated imbalance.  (Tr. 425).  Plaintiff appeared to be in no acute distress, needed no help changing for the examination or getting on and off the examination table, and was able to rise from a chair without difficulty.  (Tr. 425). Upon examination, Dr. Willner observed that Plaintiff's upper extremity joints were stable and nontender with no redness, swelling, heat, effusion, or evidence of joint deformity.  (Tr. 425).  Plaintiff's strength was 4/5 in both proximal and distal muscles and demonstrated no muscle atrophy in the upper extremities.  (Tr. 425). Dr. Willner observed that Plaintiff had no sensory abnormality and demonstrated equal physiologic reflexes in the upper extremities.  (Tr. 425).

Dr. Willner opined that Plaintiff could: 1) lift up to 20 pounds occasionally; 2) carry up to 10 pounds occasionally; 3) sit, stand, or walk for an hour without interruption; 4) sit, stand, or walk a total of seven hours in a work day; 5) never perform reaching with either hand; 6) occasionally handle, finger, feel, push/pull with both hands; 7) occasionally operate foot controls bilaterally; 8) occasionally climb stairs and ramps; 9) occasionally stoop; 10) never climb ladders, balance, kneel, crouch, or crawl; and, 11) shop, travel without assistance, walk a block on uneven surfaces, use public transportation, climb a few stairs with the use of a rail,

prepare meals, care for personal hygiene, and sort, handle and use files.   (Tr. 427-32).  Dr. Willner noted that Plaintiff was right hand dominant.  (Tr. 429).

In a range of motion chart of the shoulders, Dr. Willner indicated that Plaintiff had: 1) bilateral forward elevation of 20 degrees out of 150 degrees; 2) bilateral abduction of 80 degrees out of 150 degrees; and, 3) external rotation of 20 degrees out of 90 degrees.  (Tr. 433).  Dr. Willner noted unremarkable findings for the range of motion in Plaintiff's wrists, elbows, and fingers.  (Tr. 433, 35-36).

### 6.  Hearing Testimony: April 7, 2015

During the April 2015 hearing, the ALJ asked the Vocational Expert ("VE") to assume a hypothetical individual who was capable of "a limited range of light duty work" with the additional requirements: 1) should not perform any bilateral overhead reaching; 2) could perform up to frequent gross manipulation with the upper extremities; 3) could occasionally bend, balance, stoop, kneel, crouch, and crawling; and 4) could never use ladders, ropes or scaffolds.  (Tr. 302).  Based on these limitations, the VE opined that an individual with such limitations could not perform the past work of Plaintiff, but could work as a product assembler (DICOT 706.684-022), an order filler (DICOT 222.487-014), and a machine tender (DICOT 692.685-062).  (Tr. 302).

///

## IV.   Legal Standards and Review of ALJ Decision

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A).  A claimant for disability benefits must show that he or she has a physical or mental impairment of such a severity that:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits.  20 C.F.R. § 404.1520; *accord Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).  If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed.  20 C.F.R. § 404.1520(a)(4).  The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's

impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work.  20 C.F.R. §§ 404.1520, 416.920.  Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof.  The claimant bears the burden of proof at steps one through four.  *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Id.*  The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff.  *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

When reviewing the Commissioner's decision denying a claim for disability benefits, the Court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.  *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008).  Substantial evidence is a deferential standard of review.  *See Jones v.*

*Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Pierce v. Underwood*, 487 U.S. 552, 564 (1988) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence requires only 'more than a mere scintilla' of evidence, *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)), and may be less than a preponderance.  *Jones*, 364 F.3d at 503.  If a reasonable mind might accept the relevant evidence as adequate to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence.  *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Johnson*, 529 F.3d at 200.

## A. Residual Functional Capacity

Plaintiff argues that the ALJ erred in formulating Plaintiff's RFC of light work with the added limitations that he "should not perform any bilateral overhead reaching, and can perform up to frequent gross manipulation with the upper extremities" and could "perform occasional bending, balancing, stooping, kneeling, crouching, and crawling, but cannot use ladders, ropes, or scaffolds."  Pl. Brief at 11-15, (Tr. 274).  Plaintiff argues that:

> The ALJ does not seem to draw the appropriate distinction between gross manipulation (seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands) associated more closely with light work, and fine manipulation (fingering and feeling). The gross manipulation associated with handling is logically linked with reaching, and therefore a limitation on reaching would lead to a limitation on handling. The ALJ substituted his opinion regarding the limitations on handling for those of the medical professionals.

Pl. Brief at 14.  Plaintiff argues that the RFC is inconsistent with Social Security

Ruling ("SSR") 83-14 which explains that one of the:

> differences between sedentary and light work is that most light jobs, particularly those at the unskilled level of complexity, require . . . frequent lifting or carrying of objects weighing up to 10 pounds . . . . Any limitation of these functional abilities must be considered very carefully to determine its impact on the size of the remaining occupational base of a person who is otherwise found functionally capable of light work.

Pl. Brief at 11-12 (quoting SSR 83-14).  Plaintiff further argues that the RFC is

inconsistent with SSR 85-15 which provides:

> Reaching (extending the hands and arms in any direction) and handling (seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands) are activities required in almost all jobs. Significant limitations of reaching or handling, therefore, may eliminate a large number of occupations a person could otherwise do. Varying degrees of limitations would have different effects, and the assistance of a [Vocational Specialist] may be needed to determine the effects of the limitations.

Pl. Brief at 13 (quoting SSR 85-15).

The final responsibility for deciding a claimant's residual functional capacity is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Administrative law judges determine a claimant's residual functional capacity based on all of the relevant medical and other evidence and are not bound by any findings made by State agency medical or psychological consultants. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i); 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006); *Carl v. Colvin*, No. 3:15-CV-00895-GBC, 2016 WL 2736079, at *8 (M.D. Pa. May 11, 2016). An "'ALJ must accurately convey to the vocational expert all of a claimant's *credibly established limitations*' [and] does not have 'to submit to the vocational expert every impairment *alleged* by a claimant.'" *Hughes v. Comm'r Soc. Sec.*, No. 15-2253, 2016 WL 231676, at *3 (3d Cir. Jan. 20, 2016). The Court finds the Third Circuit opinion in *Titterington v. Barnhart*, relevant to the facts of this case. *See Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006). In *Titterington v. Barnhart*, the plaintiff argued that where the only finding that he could perform sedentary work came from the state agency, a source the ALJ discounted, the ALJ erred in his finding that his RFC included sedentary work. *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006). The Third Circuit concluded that:

> [t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC. Surveying the medical evidence to craft an RFC is part of the ALJ's duties. A reasonable factfinder, considering the evidence in the record, could well have agreed with the ALJ that [the plaintiff] could perform sedentary work.

*Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006).

In this case, the ALJ's consideration of Plaintiff's conservative treatment is a proper ground for finding Plaintiff's allegations less credible. *See* Social Security Ruling ("SSR") 96-7p ("the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints . . . and there are no good reasons for this failure)." The ALJ appropriately addressed Plaintiff's lack of medical insurance, observing:

> [Plaintiff] also stated that he did not have health insurance and it was ninety-five dollars for a follow-up visit. The undersigned questioned [Plaintiff] at both hearings as to whether he had applied for a medical access card and the claimant gave multiple inconsistent reasons for not doing so. In the initial hearing, he testified he did not apply because he was afraid of getting denied. In the second hearing, he testified that he "really tr[ies] not to use the system much," and wanted to use his heritage's way of healing. However, he admitted that "there [were] other people in worse shape than [him] that can use that."

(Tr. 275). Substantial evidence supports the ALJ's allocation of weight between the opinions of Dr. Muthiah and Dr. Willner given the totality of Plaintiff's treatment history which included stopping treatment on September 20, 2010, for

his allegedly disabling impairment.  (Tr. 238).  Although Dr. Willner's May 2015
opinion indicated that Plaintiff could never perform any form of reaching, such is
undermined by Dr. Willner's opinion that Plaintiff could still prepare meals, climb
a few stairs with the use of a rail, care for personal hygiene, and sort, handle and
use files.    (Tr. 427-32).   Dr. Willner observed that Plaintiff needed no help
changing for the examination or getting on and off the examination table, was able
to rise from a chair without difficulty, that Plaintiff's strength was 4/5 in both
proximal and distal muscles and demonstrated no muscle atrophy in the upper
extremities.   (Tr. 425).   Dr. Willner observed that Plaintiff had no sensory
abnormality and demonstrated equal physiologic reflexes in the upper extremities.
(Tr. 425).  In a range of motion chart of the shoulders, Dr. Willner indicated that
Plaintiff had bilateral forward elevation of 20 degrees out of 150 degrees and full
range of motion for the elbows, which supports the forward reaching ability in the
ALJ's RFC determination.  *See* (Tr. 433-36).  Substantial evidence supports the
ALJ reliance on Dr. Muthiah evaluation which opined that Plaintiff, who is right-
handed, had no postural limitations and had only "some" reaching and handling
limitation in the right upper extremity.   (Tr. 224-25).   Substantial evidence
supports the ALJ's conclusion that Plaintiff had an RFC that included a limitation

from bilateral overhead reaching, yet still allowed for other reaching, up to frequent gross manipulation, and no restrictions regarding fine motor skills.

Moreover, the ALJ solicited testimony from the vocational expert as to whether a person who was capable light work and could perform work available in significant numbers in the national economy with aforementioned limitations. (Tr. 302); *see Mann v. Comm'r Soc. Sec. Admin.*, 638 F. App'x 123, 126 (3d Cir. 2016); *Plummer v. Apfel*, 186 F.3d 422, 431 (3d Cir. 1999). A vocational expert ("VE") testified that individual with Plaintiff's RFC would be able to perform the requirements of representative occupations such as product assembler (DICOT#: 706.684-022), order filler (DOT#: 222.487-014), and machine tender (DOT #: 692.685-062).[3] (Tr. 277-78).

The Court finds that based on the above discussion, substantial evidence supports the ALJ's RFC determination. The ALJ reviewed all of the relevant evidence and provided a clear explanation of the reasons for his determination and ALJ's RFC was supported by medical evidence and sufficiently addressed

---

[3] The Court notes that while machine tender indicates frequent handling, it only requires occasional fingering and no feeling (DICOT 692.685-062), and any failure to include a fine motor limitation would be harmless error. *See Sweeney v. Colvin*, No. 3:13-CV-02233-GBC, 2014 WL 4294507, at *17–18 (M.D. Pa. Aug. 28, 2014) ("'a number of other courts have found harmless error where an alleged limitation that was not included in the ALJ's hypothetical (or in the RFC) was not necessary to perform one or more of the jobs identified by the VE, according to the DOT.").

Plaintiff's limitations.  *See Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004);

Fargnoli, 247 F.3d at 41 (3d Cir. 2001).

## V.    Recommendation

Therefore, the Court finds that the ALJ made the required specific findings

of fact in determining whether Plaintiff met the criteria for disability, and the

findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3);

*Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552;

*Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503.

Substantial evidence is less than a preponderance of the evidence, but more than a

mere scintilla of evidence. It does not mean a large or significant amount of

evidence, but rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

Thus, if a reasonable mind might accept the relevant evidence as adequate to

support the conclusion reached by the Acting Commissioner, then the Acting

Commissioner's determination is supported by substantial evidence and stands.

*Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the

relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I.    This appeal be DENIED, as the ALJ's decision is supported by

substantial evidence; and

II.    The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: February 22, 2017              _____s/Gerald B. Cohn_____
                                              GERALD B. COHN
                                      UNITED STATES MAGISTRATE JUDGE